## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STANFORD WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | 2:19-CV-141 |
| v. | ) | |
| | ) | |
| ERIC ARMEL, Superintendent of | ) | |
| SCI-Fayette, DISTRICT ATTORNEY | ) | |
| OF ALLEGHENY COUNTY, and | ) | |
| THE ATTORNEY GENERAL OF | ) | |
| THE COMMONWEALTH OF | ) | |
| PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | ) | |

## OPINION

In 1998, after two prior mistrials and at the conclusion of his third trial, Stanford Williams was convicted in Pennsylvania court of homicide and sentenced to life.

Because Mr. Williams's Double Jeopardy rights were violated, this Court will issue a writ of habeas corpus and order his release.

## BACKGROUND

This case comes to the Court on a writ of habeas corpus filed by Mr. Williams. ECF 3.  He raised a number of claims and supplemental claims in his writ, and the Magistrate Judge issued two separate Reports & Recommendations, ultimately recommending that all claims be dismissed. ECF 64, 85.  Those R&R's ably summarize the complicated procedural and factual background of the case, and thoroughly analyze the claims, so the Court will try to not repeat that excellent work.  But where this Court departs from the Magistrate Judge is on "Claim 3"—the Double Jeopardy claim.  The Magistrate Judge recommended that the writ be denied on that claim, ECF 64 at 17-21; ECF 85 at 3-7, but the Court respectfully disagrees.  So this opinion focuses mainly on Claim 3.

## I.    Mr. Williams's three trials.

In 1996, Mr. Williams stood trial in the Allegheny County Court of Common Pleas for homicide, among other charges, and was represented by an attorney named John Elash. ECF 9-1 at 24. After the jury deadlocked during deliberations, the trial judge—Judge Cashman—declared a mistrial. *Id.*

In 1998, at the second trial—which is the critical one for purposes of the Double Jeopardy claim—Mr. Williams again faced the same charges and was again represented by Mr. Elash. *Id.* at 25. At some point toward the end of the Commonwealth's case-in-chief, Mr. Elash raised an evidentiary issue with the court outside the jury's presence. *Id.* at 756-764. This issue had to do with a stipulation from the first trial. Specifically, in the first trial, both sides stipulated that John Faingnaert had helped Mr. Williams clean a firearm at a gun range in anticipation for hunting season. *Id.* at 757:3-13. This appeared to be based on an affidavit that defense counsel had secured from Mr. Faingnaert. *Id.* at 758:19-24. Based on the stipulation, the defense had argued that the gun residue found on Mr. Williams's hands after the murder was from cleaning his hunting rifle, not from any murder weapon. First Trial Tr., 433:15:-436:12 (November 22, 1996).

Mr. Elash raised this issue in the middle of the second trial because it appeared that the Commonwealth no longer agreed to the stipulation. Instead, the District Attorney had an investigator interview Mr. Faingnaert, and Mr. Faingnaert could only remember something about Mr. Williams adjusting the sight on his rifle, not seeing him clean it. ECF 9-1 at 761:19-762:9.

So Mr. Elash—outside the presence of the jury and without Mr. Williams present—raised this stipulation issue with the Court in the morning of the second day of trial. It's not entirely clear what relief Mr. Elash was seeking, but it appears he raised the issue in an attempt to determine whether he could use the stipulation from the first trial in the second one. In the course of discussing this issue, Mr. Elash

stated that if Mr. Faingnaert were to testify inconsistently with his prior affidavit, then Mr. Elash himself might need to testify to impeach him. *Id.* at 759:15-18. There was then some discussion on whether Mr. Elash could testify and still represent Mr. Williams, or whether there was another way to potentially impeach Mr. Faingnaert. *Id.* at 759:20-763:19. Eventually, as discussed in more detail below, the trial judge abruptly declared a mistrial. *Id.* at 763:20. He did so without obtaining any input from counsel. And the record reflects that the Court immediately recessed. *Id.* at 763:21.

In 1999, Mr. Williams was re-tried, this time being represented by a new lawyer, David Schrager, since Mr. Elash might be a witness. *Id.* at 25. Mr. Schrager never moved to dismiss the case on the basis of any Double Jeopardy issues posed by the mistrial at the end of Trial 2. Instead, the case was tried to verdict; the jury found Mr. Williams guilty on all counts; and Judge Cashman imposed a mandatory life sentence. *Id.* at 26.

## II.    The state-court decisions on the Double Jeopardy claim.

After judgment was entered, Mr. Williams appealed. On direct review, he argued that Mr. Schrager was ineffective for failing to move to dismiss the case on the basis of a Double Jeopardy violation—specifically, the trial court's declaration of a mistrial at the end of Trial 2. *Id.* at 456-462. The Superior Court held that that IAC claim was not proper on direct review, but even if it were, it failed because Mr. Williams was the one who had moved for a mistrial. *Id.* at 876-78. Mr. Williams appealed that decision through the conclusion of direct review. *Id.* at 594-616 (Pennsylvania Supreme Court review); *see Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004) (finding exhaustion by appealing through the Pennsylvania Superior Court, without review by the Pennsylvania Supreme Court) (quoting *In re Exhaustion*

*of State Remedies in Criminal and Post–Conviction Relief Cases*, No. 218 Judicial Administration Docket No. 1 (Pa. May 9, 2000) ("Order No. 218")).

On state collateral review, Mr. Williams filed a PCRA petition, raising the same IAC claim. ECF 9-1 at 709-20 (*pro se*), 829-44 (amended by *pro bono* counsel). That claim was rejected by the trial court and, after an appeal, by the Superior Court, for the same reason—that Mr. Williams was the one who moved for a mistrial. *Id.* at 936-38 (PCRA trial court ruling), 963-980 (Mr. Williams's appeal), 1052 (Pennsylvania Superior Court ruling); *see also id.* at 1055-56 (Mr. Williams's petition for allowance of appeal), 1057 (Pennsylvania Supreme Court denial of petition).

## STANDARD OF REVIEW

Because Mr. Williams timely objected to the Magistrate Judge's R&R's, "the district court must consider [those] objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law. . . This standard requires the District Court to review findings of fact for clear error and to review matters of law *de novo.*" *Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017) (quotations omitted).

## DISCUSSION & ANALYSIS

### I. "Claim 3" (the Double Jeopardy claim) can be considered on the merits.

Claim 3 has two related dimensions: first, whether the state trial court violated Mr. Williams's Double Jeopardy rights by *sua sponte* declaring a mistrial at the end of Trial 2, ECF 3 at 8; *see* ECF 64 at 17; and second, whether Mr. Williams's lawyer heading into Trial 3 (David Schrager) was ineffective for failing to move to dismiss the case due to the Double Jeopardy violation, ECF 3 at 4; *see* ECF 64 at 21 n.11; ECF 85 at 5.[1] Both aspects of this claim have no procedural bar.

---

[1] During the proceedings before the Magistrate Judge in this case, Mr. Williams retained an attorney for a brief period, and she added a few other variations of the

First, as to the "standalone" Double Jeopardy claim, the government waived any exhaustion defense. Under 28 U.S.C. § 2254(b)(3), a petitioner can avoid procedural default where the government "expressly waives" exhaustion. That waiver must be "clear, explicit, and unambiguous." *Sharrieff v. Cathel*, 574 F.3d 225, 229 (3d Cir. 2009). Here, there is no question that the government's statements in its filings in this case were a "clear, explicit, and unambiguous" expression of waiver. *See* ECF 9 at 35 ("The Superior Court rejected this claim based on the prior determination of the merits on direct appeal, therefore this claim is exhausted."); ECF 84 at 5 ("To the extent claim three raises a freestanding double jeopardy issue, it is exhausted and not procedurally defaulted."); ECF 84 at 10 n.4 ("To the extent Petitioner raises a freestanding double jeopardy claim, it is not procedurally defaulted.").[2]

---

IAC claim—specifically, alleging: (1) Trial 2 counsel (John Elash) requested a mistrial without consulting or advising Mr. Williams; and (2) Mr. Williams's "appellate and/or post-conviction counsel failed to raise the issue of successive prosecutions either on direct appeal or on collateral review." ECF 78 at 4-5. The Magistrate Judge correctly found that those two claims were procedurally defaulted, and there is no cause to overcome the default. *See* ECF 85 at 3-7.

[2] Absent waiver, the standalone claim may not have been exhausted. On direct appeal in state court, the Superior Court found that it hadn't been preserved as required by Pa. R. A. P. 302(a), and so it was waived. ECF 9-1 at 877 ("we note that Williams has not cited to any place in the record where he sought to dismiss the proceedings based upon double jeopardy before the trial court. Thus, the claim is waived."). The waiver rule is likely an independent and adequate state bar. *See Crocker v. Klem*, 450 F. App'x 136, 138 (3d Cir. 2011) ("When a state law bars a [habeas] petitioner from seeking further review of his claims in state court, the claims are procedurally defaulted."). Even though the Superior Court addressed the merits of the claim in the alternative, *see* ECF 9-1 at 878, that doesn't save it. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance[,]" so claims are similarly barred). That said, in the end, it doesn't matter. As both parties agree, the merits of both dimensions of the Double Jeopardy claim essentially rise and fall together. ECF 97 at 5-7 (Mr. Williams); ECF 102 at 29:4-16 (the government).

Second, as to the IAC aspect of the Double Jeopardy claim, Mr. Williams addressed it fully at every stage of the state-court proceedings, including through complete PCRA proceedings. *See* ECF 9-1 at 456-62 (direct appeal), 709-20 (PCRA *pro se*), 829-44 (PCRA amended by *pro bono* counsel), 958, 963-80 (PCRA appeal to Pennsylvania Superior Court), 1055-56 (petition to Pennsylvania Supreme Court). And the Commonwealth here at oral argument conceded as much. *See* ECF 102 at 29:10-12 ("At the end of the day, the ineffective assistance of counsel claim is properly before the court. I think it's been properly exhausted. . .."). So this claim is exhausted.

## II.    Mr. Williams's Double Jeopardy rights were violated.

Turning to the merits of the standalone Double Jeopardy claim, Mr. Williams argues that Judge Cashman violated his Double Jeopardy rights when he *sua sponte* declared a mistrial at the end of Trial 2. The Court agrees.

### A. Mr. Williams never moved for a mistrial.

To begin with, there is a threshold factual issue. The state courts here found that Mr. Williams affirmatively moved for a mistrial, and that this wasn't a *sua sponte* decision by the trial court. As such, the state courts held that there could be no Double Jeopardy violation. *See* ECF 9-1 at 878 (Superior Court on direct appeal declaring "Williams sought the mistrial" based on "the trial judge. . . indicat[ing] that 'Defendant's motion for a mistrial will be granted' " and recommending that "the record patently discloses that it was Williams'[s] motion for a mistrial which was granted"); ECF 9-1 at 938 (PCRA court finding, "since Williams requested the mistrial, the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions are not implicated."); ECF 9-1 at 1052 (Superior Court on PCRA appeal

---

In other words, if there was a Double Jeopardy violation that would have barred a re-trial, then counsel would have been ineffective for failing to raise it. *See* Section III below.

stating: "The PCRA court denied Williams' ineffective assistance of counsel claim, reasoning that the underlying claim lacked merit. It found that, because Williams requested a mistrial, the claim that double jeopardy barred a re-trial was meritless. This was not error.").

If it is factually correct that Mr. Williams moved for a mistrial, then his claim fails at the outset. See *United States v. Jorn*, 400 U.S. 470, 484-85 (1971) (concluding that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution"). But it's not factually correct.

Under AEDPA, there is a presumption of factual correctness. That is, any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Despite this presumption of factual correctness, the Court here has no trouble finding that Mr. Williams has overcome it by clear and convincing evidence: the certified trial transcript. The trial was transcribed, and the transcript was certified. ECF 9-1 at 764. The certified transcript reflects no motion being made by Mr. Williams for a mistrial. *Id.* at 756-64. The transcript, in fact, reflects the opposite, where Mr. Williams's counsel expressly stated that "my client's desires are for this trial to finish." ECF 9-1 at 759:16-17. The docket sheet similarly reflects no written motion for a mistrial being filed.[3] In Pennsylvania, "[t]here is a strong presumption of the validity and accuracy of the [stenographic] record," and there is no basis to second guess the record here. *Com. ex rel. Bruce v. Burke*, 90 A.2d 258, 259 (1952).

Mr. Williams has therefore overcome the presumption of factual correctness, and the Court finds no basis in the record to support the idea that Mr. Williams moved

---

[3] There is some type of minute entry that was later filed by the Court, stating that "Defense motion for a mistrial is hereby granted for [the] reasons stated on the record." ECF 9-1 at 25. This entry simply refers back to what was in the transcript.

for a mistrial—which was the lynchpin finding by the state courts in previously rejecting his Double Jeopardy claim. [4]  *See, e.g.*, *Meyers v. Gillis*, 142 F.3d 664, 667 (3d Cir. 1998) (the presumption of correctness "does not apply if the state court's findings are not fairly supported by [or clearly inconsistent with] the record"); *Attica v. Brittain*, 714 F. Supp. 3d 483, 499 (E.D. Pa. 2024) ("A clear example of an unreasonable factual determination occurs where the state court erroneously finds a fact that lacks any support in the record.") (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)).

### B. The trial court's *sua sponte* declaration of a mistrial violated Mr. Williams's Double Jeopardy rights.

Given that Mr. Williams never moved for a mistrial and instead the trial court *sua sponte* granted one, the Court considers whether the *sua sponte* declaration of a mistrial violated Mr. Williams's Double Jeopardy rights.  As both parties agree here, *see* ECF 95 at 14-15; ECF 97 at 20, this question is reviewed *de novo* and not under the deferential AEDPA standard, because no state court considered the merits of this question—*i.e.*, whether a *sua sponte* declaration of a mistrial violated Double Jeopardy.  *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017) (in situations where a petitioner has properly preserved their claim but "the state court did not consider the claim [or certain issues within the claim] on the merits," this Court's review of the state court's ultimate decision on petitioner's claim is *de novo*); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009) ("Where the state court decision is not on the merits, § 2254(d) does not apply and instead a federal habeas court applies the pre-AEDPA standard, reviewing pure legal questions and mixed questions of law and fact *de novo*.").

---

[4] At oral argument, the Commonwealth admitted as much.  ECF 102 at 30:10-11 ("I can't come up here and say that there was an express motion").

The Double Jeopardy Clause, of course, prohibits "any person [] subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend V. "[I]t protects 'a defendant's valued right to have his trial completed by a particular tribunal.' . . . But that right 'must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.' " *United States v. Brewley*, 382 F. App'x 232, 236 (3d Cir. 2010) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

Where a mistrial is declared, a defendant may only be retried for the same offense if he was the one who moved for a mistrial, which, as discussed above, Mr. Williams did not. *See Love v. Morton*, 112 F.3d 131, 138 (3d Cir. 1997) (permitting retrial "if a defendant. . . waives the right to assert double jeopardy" by moving for a mistrial). The other avenues to re-try a defendant after a mistrial are: (1) where the defendant consents to the trial court's declaration of a mistrial; or (2) where the trial court makes a finding of manifest necessity to terminate the trial. *Id.* (allowing retrial of a defendant who "consents. . ., or when there is manifest necessity to terminate the first trial.") These somewhat related inquiries are addressed in turn.

### i. Mr. Williams did not "consent" to a mistrial.

Although a defendant's consent to a mistrial declaration may bar a later Double Jeopardy claim, that consent must be clear. *Id.* A defendant's consent to a mistrial—whether express or implied—must "evince 'a deliberate election on [the defendant's] part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.' " *Brewley*, 382 F. App'x at 236 (quoting *United States v. Scott*, 437 U.S. 82, 93 (1978)). Courts may only "infer consent [to a mistrial] from defense counsel's silence [if] there was [meaningful] opportunity to object." *Love*, 112 F.3d at 138. And "close cases regarding the propriety of a mistrial 'should be resolved

in favor of the liberty of a citizen.' " *Id.* (quoting *United States ex. rel. Russo v. Superior Court*, 483 F.2d 7, 17 (3d Cir.1973)).

Here, the record is clear that Mr. Williams did not consent to a mistrial because there was no "meaningful opportunity to object" to the trial court's *sua sponte* declaration of a mistrial. *Love*, 112 F.3d at 138.

Because the transcript of the entire discussion is so critical, it is quoted without any alteration and in its entirety:

\*\*\*

PROCEEDINGS

(August 13, 1998)

MR. ELASH: Your Honor, if I can make a record, I had in the past and we had -- this is a new trial based on a hung jury and the original trial was November 19 through 22, 1996.

In that trial we entered a stipulation concerning the testimony of John Faingnaert. And the stipulation was that on the premises of the state gamelands on November 7, 1996 between 12:00 and 1:00 p.m., Mr. Faingnaert assisted Mr. Williams with the cleaning and test firing of his deer rifle for the upcoming deer season and there was a bolt action rifle.

I said it was 1993 not 1996. This was November 7, 1993. This stipulation was obtained because Mr. Faingnaert is in his seventies -- I think he was even in his seventies then -- was subpoenaed several times and was available to testify during this trial. He was present in the courtroom even at one point during this trial and I had gone over the stipulation with Mr. Radoycis at that time.

We then had a hung jury; we now had a mistrial. Before this trial Mr. Radoycis asked me, once again, for the name and address of Mr. Faingnaert; exactly what the stipulation was. I told him it was transcribed on Page 390 and 391 of the original transcript.

- 10 -

I told him that I would expect that that would be our exact stipulation this time and I told him that I had him -- either was going to have him subpoenaed this time or he would be available. He then asked me for his name and address last week. I had that. I called Nick up.

They said he was, last Friday at the very least, Maybe even Thursday, he was on vacation or off. We talked on Monday. I faxed him the information I had on the address of Mr. Faingnaert.

It is my understanding Mr. Radoycis called Mr. Faingnaert up, and he now -- and as a result of that conversation, which he said he has never saw my client cleaning his firearm or didn't assist in the cleaning of the firearm, Mr. Radoycis sent Detective Fazio out, who took a statement basically saying that, among other things -- one of the things it said in the statement is that he is not quite sure when this happened. He thinks it was a couple years ago; it couldn't have been five years ago.

We also, as part and parcel to preparation for the original trial, we had an affidavit that was obtained and notarized by Mr. Faingnaert. This affidavit was signed in 1994 and it basically is saying that in 1993 he observed Stanford fixing his equipment, sighting -- fixing his equipment.

And the affidavit can be made part of the record. This affidavit was signed in 1994; now it is going to be the testimony of Mr. Faingnaert that it couldn't have been in 1994, 1993; it was only a couple years ago. He signed an affidavit about the events years before they happened, I guess.

Now the question is I had in preparation for trial last time, I had the affidavit, I talked to Mr. Faingnaert. I believe that Mr. Faingnaert, who recognized me today and recognized that I have talked to him on several occasions, the stipulation was based on conversations I had with Mr. Faingnaert and he is saying now today that he never saw Stanford clean or never told me he cleaned his firearm.

We have Stanford's sister, who was the lady that took the affidavit from Mr. Faingnaert prior to my getting involved in the case. She would be available to testify and I am here -- my client's desires are for this trial to finish. I do not know if we can effectively waive my testimony. He would -- Mr. Williams would, if he could, I believe --

THE COURT: The problem that we have is that you can't put that testimony forward because testimony through the sister is hearsay. You would have to put him up and you would be impeaching your own witness. You couldn't waive claim of ineffectiveness for your failure to come and testify in any subsequent impeachment of that witness if put forward by Mr. Radoycis.

MR. ELASH: You're saying that he could waive the ineffectiveness?

THE COURT: No, he can't.

MR. ELASH: Could not.

THE COURT: We're left in a situation where there is no out in terms of the continuation of this particular trial.

MR. ELASH: Your Honor, I also, I don't know what Mr. Williams wants to do. I know he has paid for four different attorneys in the recent past, he has paid for two trials to me. I don't know if he has the funds to even go forward. I guess we would have to let the Court know that. Obviously, I can't continue to represent him.

THE COURT: You're going to be a witness?

MR, ELASH: I am going to be a witness. If Mr. Radoycis wants to supplement, that is my understanding.

MR. RADOYCIS: Mr. Elash and I have been in communication numerous times over the years, Judge. This week I had called Mr. Elash about two weeks ago saying how do I get ahold of this guy. Yesterday, after court, I knew we were ending; the case the stipulation was going to get in. I asked can I get a copy of the notarized statement because when I went through the notes, I did not have it.

Mr. Elash was kind enough to fax that yesterday afternoon. I read the statement, and just one of those things, decided to call him to see if it was, in fact, true.

Not intending to illicit anything tricky, I asked my questions. He said, "I remember the affidavit," and I read to him the affidavit and he said, no, he never saw him cleaning the weapon.

So I asked him a few more questions. He said he had a young black man having trouble sighting his weapon, fired ammunition, adjusted his sight. He last saw him sighting. At no time did he see him cleaning the weapon. He was adjusting the sight, because apparently this was a hunting season.

I questioned him about the dates briefly. The dates don't bother me, Judge. I understand five years ago because I was a mere stripling of 45 when it started; now I am an old man of 50.

When I saw there was a pretty big discrepancy in what was initially proffered and could very well be a misunderstanding with Mr. Elash -- I am not questioning that at all -- I am just put in the position of being damned if I do and potentially damned if I don't.

I came back to the courthouse last night, called Detective Fazio. I wrote up a subpoena and I said, "Just go out and interview the guy, develop what he has said, certify anything that I have said to him, ask him any corrections or anything like that, and write a report."

Detective Fazio called me late last night. Said he did talk to the guy. He was going to have the report. I got the report in front of me. I gave it to Mr. Elash this morning. The one statement that is made in the report, John stated he stayed at the range and did not see this male clean the rifle, nor did John help him clean it.

Obviously that is a major bone of contention with regard to the circumstancial evidence in this particular case. If, in fact, statements had been made to Mr. Elash

- 13 -

materially different from this, that is a decision the defense is going to have to make, particularly in light of the fact this is a proffered defense witness.

MR. ELASH: Your Honor, the only thing I can say is Mr. Faingnaert was here several times in the Court. He was here before the last trial. The stipulation was known. This isn't something that we just made up.

THE COURT: That is not the problem. That is not the problem as I see it. The stipulation was predicated upon your representation to Mr. Radoycis.

MR. ELASH: All he had to do was talk to him back then.

THE COURT: I understand that. He had made certain statements to you following statement that he had given to Mr. Williams's sister. The statement that he gave to Mr. Williams' sister makes no reference to the material point that is being put in about him cleaning the gun.

When he goes to challenge or at least identify that particular statement, it not corroborated by Mr. Faingnaert. The problem that we have is that you can't get that stipulation in this case.

MR. ELASH: I just wish that Mr. Radoycis would have talked to Mr. Faingnaert when Mr. Faingnaert had remembered the cleaning back years ago when he was present in the courtroom.

THE COURT: I understand that. But this is a new trial; to quote from the Pennsylvania Supreme Court a new trial occurs and you treat it as though the former trial never took place. Those are the rules and the words of the Supreme Court that I have to abide by, whether I like the import or not.

Defendant's motion for a mistrial will be granted.

(Whereupon, the trial was concluded.)

ECF 9-1 at 756-64.

***

In short, the transcript here paints a very clear story of what happened: counsel were discussing an evidentiary issue with the trial judge (*i.e.*, the use of the Faingnaert stipulation from the prior trial). Early in the discussion, when Mr. Elash was suggesting that he might be a witness if the stipulation was not used and Mr. Faingnaert testified, the trial judge commented, "We're left in a situation where there is no out in terms of continuation of this trial." But then the discussion pivoted into the specifics of the witness's testimony, whether the stipulation from the prior trial could be introduced in this case, and whether the defense would even call Mr. Faingnaert. Then, abruptly, the trial court declared a mistrial ("Defendant's motion for a mistrial will be granted."). Even more abruptly, the transcript just ends ("Whereupon, the trial was concluded."). The trial judge never asked the lawyers whether they had any responses or objections to his ruling, or, more generally, even if they had anything else to say.

From this record, it is clear that consent cannot be inferred, and there was no meaningful opportunity for the defense to object. The Third Circuit's decision in *Love* is instructive.

There, the Third Circuit held there was no opportunity to object where the trial judge informed the parties that he "would declare a mistrial" because he had to leave, thus putting them on notice, and the defendant had "five to ten minutes" after that point to consider objecting before the mistrial declaration occurred. *Love*, 112 F.3d at 134. The Third Circuit considered as important that the trial judge never inquired of counsel as to granting a mistrial, only gave counsel 5-10 minutes after to object, and the trial judge was in a state of urgency due to a family member passing away, making it difficult for counsel to raise an objection. *Id.* at 136.

This case is no different. Judge Cashman didn't ask for the input of counsel before declaring a mistrial;[5] there was no time between his declaration of a mistrial and adjourning court (as reflected in the transcript); and given how much of a non-sequitur the mistrial decision was (*i.e.*, the trial judge used the word "mistrial" for the first and only time when he declared it), no attorney would be in a position to formulate an objection. Under these circumstances, consent by Mr. Williams cannot be inferred.

Indeed, consider the cases where courts have found consent: there is always some input by counsel, notice by the court of its intent to declare a mistrial, and breathing room in the record for counsel to object. These cases are in stark contrast to this case.

- *Brewley*, 382 F. App'x at 237-38 (upon learning of the mistrial, which could have been reasonably anticipated "given the obvious direction that the proceedings had taken—with an 11-1 jury split apparent," defendant's counsel "explicitly acquiesced, stating, 'Yes, Your Honor,'" and then "instantaneously queried: 'Can we be excused?'", even as the judge "continued to address other matters with the remaining defendants for forty-five minutes" in the courtroom);

- *Arizona v. Washington*, 434 U.S. 497, 515-16, 516 n.34 (1978) ("The trial judge did not act precipitately in response to the prosecutor's request for a mistrial. On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the

---

[5] To the contrary, neither party appeared aware that Judge Cashman was seriously considering a mistrial. About a minute before he declared a mistrial, the prosecutor stated that how to proceed would be "a decision the defense is going to have to make, particularly in light of the fact this is a proffered defense witness." ECF 9-1 at 762:12-15.

propriety of a mistrial." Despite the trial judge "conceiv[ing] of no basis for the admission of such evidence and [being] tempted to grant the prosecutor's request [for a mistrial] immediately. . . he did not act precipitately. Rather. . . the trial judge reserved ruling. . . and at first denied the mistrial motion." Only after "the prosecutor renewed his motion [the following day and] the trial judge heard extensive argument from both sides" was the mistrial granted);

- *United States v. Allick*, 386 F. App'x 100, 104 (3d Cir. 2010) ("the appellants were given ample opportunity to object to the declaration of a mistrial or suggest alternative courses of action. . . [d]uring the in-chambers conference" discussing the issue resulting in the mistrial and "the in-court proceedings when [the trial judge] queried the jury foreperson and then declared a mistrial");

- *Camden v. Cir. Ct. of Second Jud. Cir., Crawford Cnty., Ill.*, 892 F.2d 610, 616-18 (7th Cir. 1989) ("the possibility of a mistrial was evident" and "should have come as no surprise" after the judge "conducted a hearing in chambers with all parties present" about a comment by a biased juror; additionally, even as "the judge. . . did not flee the courtroom immediately upon declaring a mistrial," defense counsel only thanked the jurors for their attention rather than taking that opportunity to object);

In sum, unlike these cases, this case doesn't have any of the hallmarks to suggest that Mr. Williams consented to the mistrial. The trial judge's surprise mistrial declaration deprived Mr. Elash of a "meaningful opportunity to object." *Love*, 112 F.3d at 138. And even if this were a close question, the Third Circuit's admonition that "close cases regarding the propriety of a mistrial should be resolved in favor the liberty of a citizen," *id.*, tips the scales in Mr. Williams's favor.

### ii. There was no finding of manifest necessity.

Separate from the issue of consent is one of manifest necessity. If the trial judge makes the requisite findings as to manifest necessity, then a mistrial is proper and Double Jeopardy doesn't attach. *United States v. Perez*, 22 U.S. 579, 580 (1824) ("[T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act. . . They are to exercise a sound discretion on the subject. . . the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."). To make that finding, the trial court must consider and exhaust all alternatives. *Love*, 112 F.3d at 137 ("the state must show that under the circumstances the trial judge had no alternative to the declaration of a mistrial," having "consider[ed] and exhaust[ed] all other possibilities.") (cleaned up); *United States v. McKoy*, 591 F.2d 218, 222 (3d Cir. 1979) ("the government generally must demonstrate that, under the circumstances confronting the trial judge, he had no alternative to the declaration of a mistrial. . . only by considering and exhausting all other possibilities can the judge ensure that the defendant has received the full protection of the Double Jeopardy Clause") (cleaned up). Here, that didn't occur.

The trial court never considered *any* alternatives to a mistrial; that alone dooms any finding of manifest necessity. The closest the trial judge arguably came to considering alternatives to a mistrial is when counsel and the court were discussing the *alternatives to Mr. Elash testifying* (*e.g.*, the sister testifying, or Mr. Williams waiving his right to a future IAC claim). *See* ECF 9-1 at 759:6-760:19. But that is not the same as considering the *alternatives to a mistrial*.[6]

---

[6] As all counsel in this case agree, the trial judge was also wrong in his analysis of all of the alternatives. That is, contrary to the trial judge's view, as a matter of law, Mr. Williams could have waived his Sixth Amendment right to effective assistance of counsel to permit Mr. Elash to testify while continuing to represent him. *See McKoy*,

Had the trial judge considered the alternatives to a mistrial, there were two obvious ones.  The most obvious alternative to immediately declaring a mistrial was to take a recess.  There was no urgency here.  A recess could have provided the parties and the trial court with an opportunity to consider and exhaust all alternatives to a mistrial, and also given Mr. Elash an opportunity to confer with Mr. Williams.  Where a court fails to take "a recess for an hour or two, or overnight," which could have reasonably resolved the issue giving rise to a mistrial, there is no manifest necessity. *McKoy*, 591 F.2d at 223; *see Love*, 112 F.3d at 137 ("declaring a mistrial in this case was not manifestly necessary when the decision to declare a mistrial *vel non* could have been postponed to the next morning").

The other obvious alternative was to just defer the issue.  The trial was at the point where the Commonwealth was still putting on its case.  The trial judge could have waited to see if Mr. Faingnaert would have even been called by the defense.  He also could have waited until the conclusion of Mr. Faignaert's testimony; by that point, everyone would have known whether Mr. Elash would be a potential witness.  Indeed, at the third trial after Mr. Faingnaert testified, the trial judge refused to allow Mr. Elash to be called because there was nothing to impeach.  *See* Third Trial Tr. vol. IV, 18-35 (November 23, 1999).

---

591 F.2d at 222-23; *Douglas v. United States*, 488 A.2d 121, 138-39 (D.C. 1985).  Similarly, the testimony of Mr. Williams's sister could have been introduced as non-hearsay to impeach Mr. Faignaert's inconsistent memory of whether he saw "a young black man" cleaning or sighting his weapon, even if Mr. Faignaert were to testify as a defense witness.  Pa.R.E. 801(c) (non-hearsay if not being offered to prove the truth of the matter asserted).  So even if one were to view this discussion as a consideration of alternatives to a mistrial, the trial court failed to "completely canvass" these alternatives.  *McKoy*, 591 F.2d at 222.

Manifest necessity requires a careful weighing of competing alternatives, and then a finding on the record. None of that occurred here. This means that the mistrial declaration was improper and Double Jeopardy attached.[7]

### III.    Mr. Schrager was ineffective for not seeking dismissal on Double Jeopardy grounds.

As part of Claim 3, Mr. Williams argues that his lawyer in the third trial (David Schrager) was ineffective for failing to move to dismiss the case based on the Double Jeopardy violation noted above. As discussed above, there was a clear Double Jeopardy violation here; and had it been raised by Mr. Schrager during the run-up to the third trial, the outcome would have been different because the case would have been dismissed. *See Dunkerley v. Hogan*, 579 F.2d 141, 148 (2d Cir. 1978) (granting habeas petition based on violation of Double Jeopardy rights where defense counsel raised objections).

Because Mr. Schrager's failure to raise a motion on Double Jeopardy grounds "fell below an objective standard of reasonableness," the Court finds that both parts of the *Strickland* test are satisfied. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (requiring "that counsel's performance was [so] deficient. . . that counsel was not functioning as the 'counsel' guaranteed. . . by the Sixth Amendment"; and "that deficient performance prejudiced the defense. . . depriv[ing] the defendant of a fair

---

[7] The Court has approached this issue on a *de novo* review, though still applying Section 2254(e)(1) deference to questions of fact. *See Lambert*, 387 F.3d at 235-36 ("what factual findings remain to support the state court['s ultimate] decision [after section 2254(e)(1) review] must still be weighed under the overarching standard"). However, the result would be the same even applying AEDPA's Section 2254(d) review. The trial court's *sua sponte* declaration of a mistrial in 1998 was contrary to clearly established Supreme Court law that required some degree of deliberation as to the alternatives to a mistrial and a basis to conclude that manifest necessity existed. *Arizona v. Washington*, 434 U.S. 497, 514-16 (1978); *United States v. Jorn*, 400 U.S. 470, 487 (1971) (plurality); *United States v. Perez*, 22 U.S. 579, 580 (1824).

trial."); *see Jackson v. Leonardo*, 162 F.3d 81, 85-86 (2d Cir. 1998) (not raising "sure winner" argument as "fall[ing] below the standard set forth in *Strickland*).

## IV.    Other claims brought by Mr. Williams.

The Court agrees with the Magistrate Judge as to all other claims, and otherwise adopts the recommendations as to those other claims and overrules Mr. Williams's objections.    Further, the Court declines to issue a certificate of appealability as to those other claims.  28 U.S.C. 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

## CONCLUSION

For these reasons, Mr. Williams's petition for a writ of habeas corpus is **GRANTED** as to Claim 3.  A separate order follows.

DATED: February 6, 2025                BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge